*JH*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANN LUMPKINS-BENFORD,  )
        )
    Plaintiff,  )
        )
        )    **No. 11 C 6547**
v.        )
        )    **Chief Judge Ruben Castillo**
ALLSTATE INSURANCE COMPANY,  )
        )
    Defendant.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Ann Lumpkins-Benford, proceeding *pro se*,[1] brings this suit against Defendant

Allstate Insurance Company, alleging employment discrimination on the bases of race and sex

and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII") and 42 U.S.C. § 1981. Presently before the Court are Defendant's motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56 and Defendant's motion to

strike some of Plaintiff's statements of fact. For the reasons set forth below, Defendant's motion

to strike is granted in part, and Defendant's motion for summary judgment is granted.

## RELEVANT FACTS[2]

Before summarizing the facts of this case, the Court notes that Defendant has objected to

---

[1] This Court previously appointed an attorney for Plaintiff in an effort to avoid some of the
difficulties with proceeding on a *pro se* basis. (R. 5, Min. Order.) Unfortunately, Plaintiff and
her counsel did not agree on litigation strategy, and counsel withdrew. (R. 45, Min. Order.)
Despite the Court's persistent advice to Plaintiff that she should obtain counsel, Plaintiff has
repeatedly stated that she prefers to represent herself. (*E.g.*, R. 46, Pl.'s Mot. Reinstate at 2-3.)

[2] The Court takes the facts from the parties' statements of facts. (R. 65, Def.'s Local Rule 56.1
Statement of Facts ("Def.'s Facts"); R. 68, Tab C, Pl.'s Local Rule 56.1 Response to Def.'s Facts
("Pl.'s Rule 56.1 Resp."); R. 68, Tab D, Pl.'s Local Rule 56.1 Add'l Statement of Facts ("Pl.'s
Facts"); R. 72, Def.'s Local Rule 56.1 Response to Pl.'s Facts ("Def.'s Rule 56.1 Resp."); R. 68,
Tab A, Pl.'s Fed. Rule 56 Statement of Disputed Facts ("Pl.'s Disputed Facts"); R. 73, Def.'s
Resp. Pl.'s Disputed Facts ("Def.'s Resp. Disputed Facts").

several of Plaintiff's responses to Defendant's statement of undisputed facts, as well as to

portions of Plaintiff's statements of additional facts and disputed facts, for failure to comply with

Local Rule 56.1. (R. 74, Def.'s Objections & Mot. Strike.) Although this Court typically strictly

enforces Local Rule 56.1, *see Malec v. Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000), it is appropriate

to apply the Rule less strictly to *pro se* pleadings, *see Lipsey v. United Parcel Serv., Inc.*, 618 F.

Supp. 2d 903, 905 n.2 (N.D. Ill. 2009). However, a *pro se* litigant is not completely excused

from the requirements of Local Rule 56.1, which requires the non-movant's response to the

movant's statement of facts to contain, "in the case of any disagreement, specific references to

the affidavits, parts of the record, and other supporting materials relied upon." Local R.

56.1(b)(3)(B); *see Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 654 (7th Cir. 2011) ("We have

emphasized the importance of local rules and have consistently and repeatedly upheld a district

court's discretion to require compliance with its local rules governing summary judgment.")

(quoting *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002)). The Court

accordingly sustains many of Defendant's objections.

Specifically, several of Plaintiff's responses to Defendant's facts are not denials

supported by the record, but rather conclusory assertions, conjecture, additional facts, or

argumentative denials without citations to specific evidentiary materials. The consequence of

Plaintiff's failure to satisfy Local Rule 56.1 in her responses is that the factual allegations she

improperly responded to are deemed admitted.[3] Additionally, several of the "paragraphs" in

Plaintiff's statement of additional facts, which themselves contain multiple paragraphs, are

speculations and legal arguments or are unsupported by any submitted evidence. Other

---

[3] Specifically, the Court finds that the following responses in Plaintiff's response to Defendant's facts, (R. 68, Tab C, Pl.'s Rule 56.1 Resp.), fail to satisfy Local Rule 56.1: ¶¶ 11, 17, 18, 20-23, 25, 26, 29, 31, 33-40, 46, 49, 52-54, 59-62, 64-68, 71, 72, 76.

2

statements are supported only by citations to letters or emails that Plaintiff wrote. While these correspondences may prove that Plaintiff provided certain information to Defendant, they do not prove that the substance of the correspondence is true. Accordingly, the Court disregards certain portions of Plaintiff's additional facts.[4] Finally, Plaintiff's amended statement of fact consists of six additional "facts"; Plaintiff admits, however, that all but the first fact are immaterial. (R. 78, Pl.'s Am. Facts at 4.) The Court thus disregards Plaintiff's additional facts two through six.

With these exclusions made, the Court now turns to the facts giving rise to this suit, viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor. *See Benuzzi*, 647 F.3d at 656. The facts are undisputed unless otherwise indicated.

Plaintiff is a black female citizen and resident of Will County, Illinois. (Pl.'s Rule 56.1 Resp. ¶ 3.) Defendant is a corporation that provides insurance in the state of Illinois. (*Id.* ¶ 2.) Plaintiff was employed at Defendant's Woodridge Customer Contact Center ("WCCC") in Woodridge, Illinois from August 2005 until the WCCC closed in August 2013. (*Id.* ¶ 4; Def.'s Resp. Disputed Facts ¶ 23.) From approximately July 2008 to December 2010, Plaintiff worked from home as part of a home-based worker pilot program (the "Work-at-Home program"), servicing Defendant's customers over the telephone. (Pl.'s Rule 56.1 Resp. ¶¶ 5, 7.) Plaintiff stopped working from home in January 2011 and returned to work at WCCC. (*Id.* ¶ 7.) While participating in the Work-at-Home program, Plaintiff's direct manager was Patrice Walls, but once she returned to WCCC, Letta Faye Lis became her direct supervisor. (*Id.* ¶¶ 6, 7.) Both Walls and Lis reported to Elena Withers, the division manager. (*Id.* ¶¶ 7, 9.)

---

[4] The Court finds that parts of ¶¶ 1 and 3-6 of Plaintiff's Facts, (R. 68, Tab D, Pl.'s Facts), fail to comply with Local Rule 56.1, as do parts of ¶¶ 1-23 of Plaintiff's "Disputed Facts," (R. 68, Tab A, Pl.'s Disputed Facts).

## I.     Plaintiff's 2009 Complaint

In 2009, Plaintiff complained about her job duties to April White, her supervisor at the time, and Withers. (*Id.* ¶ 9.) She did not indicate in her complaint to White that she thought she was being discriminated against due to her race or gender. (*Id.*) In that complaint, Plaintiff stated that she felt "singled out" for some unknown reason, but not because of her race or gender. (*Id.*; R. 65-3, Pl.'s Second Dep. at 42:5-24.) Plaintiff also complained to her site manager, Ann Gross, that she was not being given enough time off from her phone duties so she could be trained to write renter's policies. (*Id.* ¶ 10.)

One day in December 2010, Plaintiff worked for eight hours. (Pl.'s Rule 56.1 Resp. ¶ 17.) Plaintiff was originally paid for all eight hours, but in January 2011, someone in the Timekeeping Department changed the code on four of the hours, which resulted in four hours being subtracted from her February paycheck. (*Id.*; R. 65-3, Pl.'s Second Dep. at 24:10-16.) Plaintiff reported the incident to the Human Resources Department, and it investigated the issue. (Pl.'s Rule 56.1 Resp. ¶ 17.) Plaintiff received the payment she was due for the missing four hours in late February or early March 2011. (*Id.*; R. 65-3, Pl.'s Second Dep. at 26:3-12.) Plaintiff contends that this mix-up was in retaliation for her 2009 internal complaint. (R. 65-3, Pl.'s Second Dep. at 25:1-9.) Plaintiff also believes that her performance reviews for the years 2009, 2010, and 2011 were negatively impacted in retaliation of her 2009 complaint. (Pl.'s Rule 56.1 Resp. ¶ 12.) Plaintiff's 2009 complaint did not allege discrimination on the basis of race or sex, however, and Plaintiff admits that no one made any statements about her race or gender with respect to this timekeeping incident. (*Id.* at 27:15-18; Def.'s Facts ¶ 18.)

## II.    Plaintiff's Three-Week Absence from Work

Throughout her employment with Defendant, Plaintiff had a Paid Time Off ("PTO") bank. (Pl.'s Rule 56.1 Resp. ¶ 19.) If Plaintiff wanted paid time off, she could request that time to be deducted from her PTO bank. (*Id.*) Plaintiff had 28 days of PTO available to her in 2011, and she took and was paid for all 28 PTO days. (*Id.* ¶ 58.) In Defendant's attendance policy, an "occurrence" is an incident when an employee takes time away from work that was not previously approved. (Def.'s Facts ¶ 23.) One occurrence represents eight hours of unscheduled and unapproved time away from work or four tardies. (R. 70, Pl.'s Supporting Docs., Tab 24, Attendance Guidelines.) Occurrences are tracked on a yearlong rolling basis; if an employee receives a certain number of occurrences, her job may be in jeopardy. (Pl.'s Rule 56.1 Resp. ¶ 24.) The number of occurrences an employee can receive without suffering negative consequences is determined by the employee's tenure with Defendant. (*Id.*) In 2011, Plaintiff could incur five occurrences before being subject to disciplinary action. (*Id.*)

Defendant's Timekeeping Department uses the code "PTON," for Paid Time Off Non-scheduled, to indicate when employees take unscheduled time off from work that is paid. (Pl.'s Rule 56.1 Resp. ¶ 30.) The code "UNDU," for Short-term Disability Unauthorized Unpaid, is used when employees take unscheduled time off from work that is not paid for short-term disability reasons. (*Id.*) The code "PU," for Personal Unpaid, is used when employees take unpaid unscheduled time off from work for personal reasons. (*Id.*) Defendant's practice when employees have extended unscheduled absences is to code the first workweek of unscheduled time an employee takes off as PTON. (*Id.* ¶ 32; R. 70, Pl.'s Supporting Docs., Tab 7, Manager's Job Aid.) If employees take more than one workweek of unscheduled time off from work, Defendant's practice is to use the code PU or UNDU, depending on the reason given for the time

5

off. (Pl.'s Rule 56.1 Resp. ¶ 32; R. 70, Pl.'s Supporting Docs., Tab 7, Manager's Job Aid.)
When no reason is given, Defendant's default code for the unscheduled time employees take off
from work after the first workweek is UNDU. (Def.'s Facts ¶¶ 33-37; R. 65-7, Del Real Decl. ¶
6; R. 65-8, Musser-Quist Decl. ¶ 6.) Emails between Sheena Turman, Manager of Timekeeping,
and Lynn Murphy, Human Resources Senior Manager, indicate that the policy of entering the
default code UNDU after more than five days absence is unwritten and was verbally
communicated to Defendant's employees in the Human Resources Department. (R. 70, Pl.'s
Supporting Docs., Tab 14, Mar. 23, 2011 E-mails.)

Plaintiff knew that Defendant expected its employees to request PTO in advance when
possible. (Def.'s Facts ¶ 20; R. 65-3, Pl.'s Second Dep. at 79:16-21.) In December 2010,
Plaintiff requested PTO for January 4-6, 2011. (Def.'s Facts ¶ 21.) Plaintiff was waitlisted for
those days, which meant she did not have approval to take the days off and was expected to go to
work or else receive an occurrence for taking the time off without approval. (*Id.*; Pl.'s Rule 56.1
Resp. ¶ 21; R. 65-3, Pl.'s Second Dep. at 92:18-93:2.) Instead, when she discovered she would
receive an occurrence for January 4-6 because her request was not approved, Plaintiff decided to
take the whole week off. (Def.'s Facts ¶ 22; R. 65-3, Pl.'s Second Dep. at 95:3-6.) Plaintiff
knew she would receive an occurrence for her weeklong absence.[5] (*Id.* ¶ 23; R. 70, Pl.'s
Supporting Docs., Tab 19, Dec. 31, 2010 E-mails.) Plaintiff emailed Turman and Lis on

---

[5] Despite the official guidance as to how occurrences are to be issued, (R. 70, Pl.'s Supporting
Docs., Tab 24, Attendance Guidelines), Plaintiff seemed to assume that she would receive one
occurrence for each uninterrupted absence—of relevance here, that she would receive one
occurrence for the entire three-week absence. (*See* R. 70, Pl.'s Supporting Docs., Tab 19, Dec.
31, 2010 E-mails.) In fact, Plaintiff received three occurrences for the three-week absence.
(Pl.'s Disputed Facts ¶ 8; R. 70, Pl.'s Supporting Docs., Tab 25, Jan. 26, 2011 HR E-mail.)
Neither party address the inconsistency between the Attendance Guidelines and practice or
provides any evidence as to how many occurrences are typically issued in response to a multi-
day absence.

December 31, 2010, and stated that she would "more than likely take an occurrence for the entire week" of January 4-8, 2011. (Pl.'s Disputed Facts ¶ 7; R. 70, Pl.'s Supporting Docs., Tab 23, Dec. 31, 2010 E-mails.) Sheena Turman replied by email the same day and informed Plaintiff that she was required to call Timekeeping daily to avoid being coded as a "No Call No Show." (R. 70, Pl.'s Supporting Docs., Tab 19, Dec. 31, 2010 E-mails.)

Plaintiff ended up taking three full unscheduled weeks off from work in January 2011: January 4-8, 11-15, and 18-22. (Def.'s Facts ¶ 25.) Plaintiff did not receive approval to take January 4-8 off, and she did not request or receive approval to take January 11-22 off from work. (*Id.*; R. 65-3, Pl.'s Second Dep. at 97:5-20, 100:10-15.) Plaintiff planned to return to work on January 11, but her daughter fell ill on January 10. (*Id.* at 95:13-22.) Plaintiff took the week of January 11-15 off to take care of her sick children. (*Id.* at 96:3-15.) Plaintiff planned to return to work on January 18, but then she became ill and was too sick to work January 18-20. (*Id.* at 98:6-99:2.) Plaintiff could have returned to work on January 21, but she spoke to Lis on January 20 and discovered that she would not be paid for the second and third weeks of her absence. (*Id.* at 100:16-101:15.) This discovery made her feel very stressed, so she decided not to go to work on January 21 or 22. (*Id.* at 101:6-18.)

Plaintiff contacted the Timekeeping Department every day during her absence and left her name, identification number, manager's name, and the time requested off. (R. 65-3, Pl.'s Second Dep. at 99:22-100:1, 102:14-21.) Plaintiff was paid for the week of January 4-8 and was not paid for the second and third week she took off from work. (Def.'s Facts ¶ 29.) Plaintiff's absences during the week of January 4-8 were coded PTON. (*Id.* ¶ 31.) Plaintiff's second and third weeks of absence were coded UNDU. (*Id.* ¶¶ 32, 35.) The Staff Schedule Specialists who entered the UNDU code during Plaintiff's second and third weeks—Ivan Del Real, Kim Musser-

7

Quist, and Nikki Harris—did so as a matter of course based on their understanding of Defendant's policy. (*Id.* ¶¶ 33, 34, 36, 37.) Plaintiff received three occurrences for her three-week absence. (Pl.'s Disputed Facts ¶ 8; R. 70, Pl.'s Supporting Docs., Tab 25, Jan. 26, 2011 HR E-mail.)

On January 25, 2011, Plaintiff's first day back at work after her three-week absence, Turman sent Plaintiff an email explaining why she was not getting paid for her second and third weeks of absences. (Def.'s Facts ¶ 38.) In the email, she stated: "After five days of employees calling off, the code is no longer PTO. On the 6th day, we code UNDU or PU depending on whether the employee has provided us with the reason on [sic] the extended absence." (*Id.*; R. 65-2, Pl.'s First Dep., Ex. 5, Jan. 25, 2011 E-mail.) On January 26, 2011, Plaintiff received an email from Lis explaining that "after 5 days away, timekeeping would reflect UNDU." (Def.'s Facts ¶ 40; R. 65-2, Pl.'s First Dep., Ex. 5, Jan. 26, 2011 E-mail.) Lis told Plaintiff she was unaware of the policy, and that she requested that Plaintiff's absence on January 20 be coded as PTON. (*Id.*) On January 27, 2011, Plaintiff received an email from Withers, which also informed her that she would not be paid for her second and third week of absences. (Def.'s Facts ¶ 39; R. 65-2, Pl.'s First Dep., Ex. 5, Jan. 27, 2011 E-mail.) Plaintiff alleges that she had been following the 2008 Attendance Guidelines that were posted online. (Pl.'s Disputed Facts ¶ 6.) When she brought this fact to Defendant's attention, Defendant removed the 2008 Attendance Guidelines from the website. (Pl.'s Disputed Facts ¶ 6.) Defendant also showed Plaintiff the current guidelines that indicated that she would not be paid for the second and third weeks she was out of the office. (Def.'s Resp. Disputed Facts ¶ 6; R. 70, Pl.'s Supporting Docs., Tab 21, March 15, 2011 HR Notes; R. 70, Pl.'s Supporting Docs., Tab 22, May 11, 2011 E-mail.)

Plaintiff is unaware of any comments Withers might have made about Plaintiff's race and gender or her 2009 complaints with respect to Plaintiff's not being paid for January 11-22, 2011. (Def.'s Facts. ¶ 47; R. 65-3, Pl.'s Second Dep. at 123:8-24.)

Plaintiff alleges that two white coworkers, Jill Moser and Eric Griffin, were treated differently than she was treated. (Pl.'s Rule 56.1 Resp. ¶ 52.) Specifically, Plaintiff alleges that Moser was able to use PTO for 13 unscheduled days away from work, even though Plaintiff was only paid for five. (*Id.* ¶ 54.) Defendant's timekeeping records from the period between January 1, 2011, and February 25, 2012, however, show that Griffin did not take more than five consecutive days off that were coded as PTON. (R. 65-4, Thesen Decl., Ex. C, Griffin Timekeeping Record.) Defendant's timekeeping records as to Moser between February 11, 2010, and January 11, 2013, show that she also did not have more than five consecutive days that were coded as PTON. (R. 65-4, Thesen Decl., Ex. D, Moser Timekeeping Record.) Moser had four days coded PTON in January 2011 and was paid for those days, even though she had only earned less than one day of PTO. (Def.'s Resp. Disputed Facts ¶ 3.) Likewise, when Plaintiff's first five days off in January 2011 were coded PTON, she had only earned one day of PTO. (*Id.*)

Plaintiff made her first internal complaint of racial discrimination in an e-mail to Kris Peterson, the Human Resources representative, and Tom Wilson, Defendant's CEO, on or about May 21, 2011. (Pl.'s Rule 56.1 Resp. ¶ 48.) Plaintiff's second internal complaint of racial discrimination was made in May, June, or July 2011 to Lis. (*Id.*) Plaintiff made her first written complaint to the Equal Employment Opportunity Commission ("EEOC") on May 22, 2011, and filed her first charge on July 1, 2011, alleging discrimination on the bases of race and sex. (*Id.* ¶ 49; R. 69, Pl.'s Rule 56.1 Docs., Ex. IV, EEOC Charge.) In her first charge, Plaintiff alleged that

9

she was not paid for time she took off from work due to her race and sex. (Pl.'s Rule 56.1 Resp. ¶ 49.)

## III. The Black Balloon Incident

In May 2011, shortly after Plaintiff's email to Peterson and Wilson, balloons were taped to employees' desks as part of an office celebration. (Pl.'s Disputed Facts ¶ 20; Pl.'s Rule 56.1 Resp. ¶ 52; R. 70, Pl.'s Supporting Docs., Tab 4, Lis Decl. ¶ 37.) The balloons taped to Plaintiff's and Lis's desks were black; all of the other balloons were brightly colored. (R. 70, Pl.'s Supporting Docs., Tab 4, Lis Decl. ¶¶ 37-39.) The balloons for the celebration were navy, yellow, and ivory, and they were purchased by Melissa Lee Cuellar. (Pl.'s Rule 56.1 Resp. ¶ 53; R. 70, Pl.'s Supporting Docs., Tab 2, Cuellar Expense Reports.) Plaintiff does not know who placed the black balloon on her desk or why. (Def.'s Facts ¶ 53.) Plaintiff believes that the black balloons were Defendant's way of "calling her the 'N' word and [calling Lis] the 'N' word lover for supporting her." (R. 70, Pl.'s Supporting Docs., Tab 4, Lis Decl. ¶ 40.) Lis believed that the black balloons indicated that she and Plaintiff were being targeted, and she stated that having the black balloon taped to her desk was humiliating. (Id. ¶¶ 41, 46.) Lis and Plaintiff agree that the black balloons taped to their desks were intended to send a message because there were balloons of other colors in the office that could have been used instead. (Id. ¶ 45.)

## IV. Other Incidents

Defendant alleges that Plaintiff had scheduled August 20, 2011, as time off from work. (Def.'s Facts ¶ 61.) Plaintiff alleges that she attempted to schedule that day off but did not know whether her request had been approved. (Pl.'s Rule 56.1 Resp. ¶ 61; R. 65-3, Pl.'s Second Dep. at 5:13-6:4.) She contends that the standard practice was for timekeepers to e-mail an employee approximately three days before a requested absence to let the employee know if the requested

10

time off was scheduled or waitlisted, but she never received an e-mail with regards to August 20, 2011. (Pl.'s Rule 56.1 Resp. ¶ 61.) Plaintiff arrived to work fifteen minutes late on August 20. (Def.'s Facts ¶¶ 61, 62.) When Plaintiff was informed that she was scheduled to have the day off, she requested to use fifteen minutes of the paid time off she was scheduled for to cover her tardy. (*Id.* ¶ 62; R. 70, Pl.'s Supporting Docs., Tab 45, Emergency Time E-mails.) Plaintiff's request to use PTO to cover her tardy was initially denied. (Pl.'s Rule 56.1 Resp. ¶ 62; R. 70, Pl.'s Supporting Docs., Tab 45, Emergency Time E-mails.) Ultimately, however, Plaintiff was allowed to use PTO to cover the tardy. (Def.'s Facts ¶ 62; R. 70, Pl.'s Supporting Docs., Tab 45, Emergency Time E-mails.) This incident did not affect Plaintiff's pay or employment status. (Def.'s Facts ¶ 63.)

In August or September 2011, Plaintiff was unable to access the work premises with her security badge one day. (*Id.* ¶ 64.) After attempting to enter the building a few times, Plaintiff drove around to the front of the building so the security guard could let her in. (Def.'s Facts ¶ 65; R. 65-3, Pl.'s Second Dep. at 16:9-15.) By the time she got into the building, she was late for her scheduled shift. (Pl.'s Disputed Facts ¶ 15.) The security guard fixed the issue with Plaintiff's badge so she could get in and, a few weeks later, showed her a list of names of employees who had a similar issue with their security badges. (Pl.'s Rule 56.1 Resp. ¶ 65.) Plaintiff does not have any idea who or what caused her security badge to malfunction. (Def.'s Facts ¶ 64; R. 65-3, Pl.'s Second Dep. at 18:11-23.) Plaintiff alleges that the revocation of her access was in retaliation to her complaints or her EEOC charge. (Pl.'s Rule 56.1 Resp. ¶ 64.) This incident did not impact Plaintiff's pay or her employment status, and she did not receive an occurrence for the incident. (Def.'s Facts ¶ 66.) No one made any statements to Plaintiff about

Plaintiff's complaints, her EEOC charge, her race, or her gender with respect to this incident. (*Id.* ¶ 67.)

In the past, Plaintiff was given the time needed at work to complete her continuing education courses. (Def.'s Facts ¶ 71; R. 22, Def.'s Answer ¶ 63.) Plaintiff contends that beginning some time in 2011, she was no longer given sufficient time to complete her courses. (Def.'s Facts ¶ 71.) In addition to not being given enough work time, the time she did use was not properly coded; thus, it negatively impacted her productivity. (Def.'s Resp. Disputed Facts ¶ 11.) Plaintiff does not know if anyone else at WCCC began to experience time limits in completing their continuing education courses in or around 2011. (Pl.'s Rule 56.1 Resp. ¶ 73.) Plaintiff believes this change was retaliatory because Turman colluded with Withers to discriminate against her. (Def.'s Facts ¶ 72; R. 65-3, Pl.'s Second Dep. at 9:3-11:7.) In addition, Plaintiff experienced several mistakes and miscommunications with regards to her timekeeping and her schedule between December 2009 and January 2012. (Pl.'s Rule 56.1 Resp. ¶ 72; R. 69, Pl.'s R. 56.1 Docs., Ex. IX, Timekeeping E-mails.) Plaintiff believes that these mistakes constitute harassment by Walls, Withers, and the timekeepers. (Def.'s Facts ¶ 76.)

From 2005 through 2008, Plaintiff received an "outstanding" rating every year on her performance review. (Def.'s Resp. Disputed Facts ¶ 10.) She also received several awards and recognitions from her coworkers and supervisors and from customers she assisted. (*Id.*) On her 2009 and 2010 annual reviews, however, Plaintiff received a "fair" rating. (*Id.*) In February 2011, after Plaintiff contested her 2010 rating, it was increased from "fair" to "successful." (*Id.*) Plaintiff believes that her performance review for 2011 was changed and her pay increase was reduced. (Def.'s Facts. ¶ 15.) She testified that Lis went over Plaintiff's performance review with her before Lis left her position with Defendant. (*Id.*) Plaintiff further testified that after

12

Lis's departure, some of Lis's positive comments were removed from the performance review. (*Id.*) In addition, Plaintiff testified that Lis had informed her that she would receive a 5% pay increase, but Plaintiff only ended up receiving a 3% pay increase. (*Id.* ¶ 16.)

Plaintiff made a second written complaint to the EEOC on September 7, 2011, and filed her second charge on September 16, 2011, alleging race and sex discrimination and retaliation against her first EEOC charge. (Pl.'s Rule 56.1 Resp. ¶ 50; R. 65-11, Barsanti Decl., Ex. C, Pl.'s Second EEOC Charge.) Specifically, she alleged that in retaliation to her first charge, she was subjected to different terms and conditions of employment, such as having a black balloon taped to her desk, being denied access to the building, and not being given enough time to complete a required continuing education course. (*Id.*)

In May 2012, Plaintiff was approved for leave under the Family Medical Leave Act ("FMLA") for two weeks. (Pl.'s Rule 56.1 Resp. ¶ 68; R. 65-3, Pl.'s Second Dep. at 32:4-17.) The timekeeping for some of this time was not properly coded, and Plaintiff returned to work to discover occurrences for several days that were coded as unapproved. (Def.'s Facts ¶ 68.) Plaintiff reported the issue to Defendant's FMLA Department. (Pl.'s Local Rule 56.1 Resp. ¶ 69.) Subsequently, the timekeeping for her FMLA leave was properly coded and the occurrences were removed. (*Id.*)

On June 13, 2013, Defendant announced that it would close WCCC on August 11, 2013. (Def.'s Rule 56.1 Resp. ¶ 2; R. 70, Pl.'s Supporting Docs., Tab 55, General Release.) Tyrone Burno, Director of Workforce Relations for Defendant, notified every employee at WCCC that they were eligible to receive severance pay but were required to sign a general release and waiver of all claims in accordance with the Allstate Severance Pay Plan. (R. 72-1, Burno Decl. ¶ 5-6.) Defendant informed Plaintiff that she was eligible for severance as a result of the office

closing, but that she had to sign a waiver to release all her claims against Defendant, specifically including the present action, in order to receive her severance. (Def.'s Rule 56.1 Resp. ¶ 2; R. 70, Pl.'s Supporting Docs., Tab 55, General Release.) Burno stated that he met with Plaintiff separately because she had claims pending and Defendant wanted to make sure she understood the consequences signing the waiver would have for this suit. (R. 72-1, Burno Decl. ¶ 11.) The General Release and Waiver prepared for Plaintiff included bold-faced language specifying that the claims Plaintiff would waive included all claims that were or could have been asserted in this suit. (Pl.'s Rule 56.1 Docs., Tab 59, General Release.)

Plaintiff also alleges that Defendant harassed and discriminated and retaliated against her by removing the half-wall that blocked the noise from her desk. (Pl.'s Disputed Facts ¶ 19.) Plaintiff provides no evidence to support this claim, and Defendant disputes it, (Def.'s Resp. Disputed Facts ¶ 19).

## PROCEDURAL HISTORY

On October 21, 2011, Plaintiff filed her *pro se* complaint in this action. (R. 6, Compl.) Plaintiff alleges discrimination on the bases of her race and sex, a hostile work environment, and retaliation. (*Id.* ¶ 12). The Court appointed counsel to represent Plaintiff, (R. 5, Min. Entry), but granted counsel leave to withdraw on September 18, 2012, (R. 45, Min. Entry), and Plaintiff has been proceeding *pro se* since then. Defendant moved for summary judgment on May 29, 2013. (R. 63, Def.'s Mot.) Plaintiff responded on July 11, 2013, (R. 68, Tab B, Pl.'s Resp.), and Defendant replied on July 26, (R. 71, Def.'s Reply). Defendant also filed a motion to strike each of Plaintiff's additional statements of material fact and statements of disputed fact, as well as most of her responses to Allstate's statements of fact. (R. 74, Def.'s Mot. Strike.) Upon noticing that Defendant failed to serve Plaintiff with an explanation in lay terms of what litigants must do

14

to overcome a motion for summary judgment, as required by Local Rule 56.2 when motions for

summary judgment are opposed by *pro se* litigants, the Court provided Plaintiff with such

explanation and granted her time to amend her statements of fact. (R. 77, Order.) Plaintiff filed

an amended statement of fact on September 20, 2013, (R. 78, Pl.'s Am. Statement of Fact),[6] and

Defendant responded on September 26, 2013, (R. 79, Def.'s Resp.).

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.

R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists,

the Court must view the evidence and draw all reasonable inferences in favor of the party

opposing the motion. *Id.* at 255; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704

(7th Cir. 2011) ("[D]istrict courts are not required to draw every requested inference; they must

only draw reasonable ones that are supported by the record."). The Court does not evaluate the

weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of

the matter; instead the Court's role is simply to ascertain whether there exists a genuine issue of

triable fact. *Anderson*, 477 U.S. at 249-50. "The moving party bears the initial burden of

demonstrating that these requirements have been met; it may discharge this responsibility by

showing 'that there is an absence of evidence to support the non-moving party's case.'" *Wheeler

v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[6] Rather than amending the various statements of fact she had already submitted to bring them
into conformity with Local Rule 56, Plaintiff simply pleaded six additional facts. (R. 78, Pl.'s
Am. Facts.)

15

323 (1986)). Once the moving party has met this burden, the non-moving party must "come forward with specific facts demonstrating that there is a genuine issue for trial." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement," *id.*, and the non-moving party may not rely on "mere conclusions or allegations" to create a genuinely disputed issue of material fact, *see Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, the nonmoving party "must make a showing sufficient to establish any essential element of her cause of action for which she will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997); *see also Celotex*, 477 U.S. at 322-23.

On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (referring to Local Rules 12(M) and (N), which were replaced by Local Rule 56). To adequately dispute a statement of fact, the opposing party must cite specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *Malec*, 191 F.R.D. at 585; *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

## ANALYSIS

Defendant contends that it is entitled to summary judgment because Plaintiff presents no evidence to support her allegations of discrimination, hostile work environment, or retaliation. (R. 64, Def.'s Mem. at 7-13.) Defendant additionally contends that Plaintiff admitted in her deposition that gender discrimination is not a claim in this lawsuit, and her discrimination claim

16

is limited to race. (*Id.* at 1 n.1.) In Plaintiff's first deposition, she testified that she did not believe she was discriminated against based on her gender. (Def.'s Facts ¶ 59; R. 65-2, Pl.'s First Dep. at 55:14-17.) Plaintiff does not dispute this in her response to Defendant's motion, (*see* R. 68, Tab E, Pl.'s Mem.), and the Court accordingly grants Defendant's motion for summary judgment as it pertains to Plaintiff's sex discrimination claim. Plaintiff contends, however, that Defendant is not entitled to summary judgment on her race discrimination, hostile work environment, and retaliation claims. (*Id.* at 3-6.)

## I.     Plaintiff's Discrimination Claim

Plaintiff claims that she was discriminated against on the basis of her race. (R. 6, Compl. ¶¶ 9, 12.) Title VII of the Civil Rights Act of 1964 prohibits employers from treating employees differently on the basis of race. 42 U.S.C. § 2000e-2. A plaintiff may prove discrimination under Title VII through the "conventional method of presenting a 'convincing mosaic' of direct or circumstantial evidence"—the direct method of proof. *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). If the plaintiff employs the direct method of proof, she may rely on circumstantial evidence but that evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Circumstantial evidence that can form a "convincing mosaic" fall into three categories: (1) suspicious timing, ambiguous statements, "and other bits and pieces from which an inference of" discriminatory or retaliatory intent can be drawn; (2) evidence "that similarly situated employees were treated differently"; and (3) "evidence that the employer offered a pretextual reason for an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (internal citations and quotation marks omitted) (noting that the second and third categories of

circumstantial evidence overlap with the indirect method of proof's requirements to establish a *prima facie* case).

A plaintiff that has failed to establish discriminatory intent under the direct method may nonetheless ultimately prevail through the indirect method of proof—the burden-shifting approach first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Brewer*, 479 F.3d at 915. Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of race discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a *prima facie* case of discrimination, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was meeting the defendant's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside of the protected class more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once a *prima facie* case is established, a rebuttable presumption of employment discrimination is created, and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993). If the defendant cannot satisfy its burden, summary judgment will be denied. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). If the defendant does provide noninvidious reasons for its actions, the burden shifts back to the plaintiff to show that the articulated reasons were pretextual. *Hong*, 993 F.2d at 1261.

**A.    Whether Plaintiff has proved discrimination through the direct method**

Plaintiff contends that she has provided evidence that establishes her discrimination claim through the direct method of proof. (R. 68, Tab E, Pl.'s Mem. at 2.) The evidence Plaintiff contends points directly to discrimination is that a black balloon was taped to her desk shortly after she e-mailed Wilson and Peterson alleging race discrimination (the "black balloon

18

incident"). (R. 68, Tab E, Pl.'s Mem. at 2.) Plaintiff contends that she had over 100 coworkers

at the time, and each of them had a white, yellow, or blue balloon taped to their desks except Lis,

who had supported Plaintiff's efforts to get paid for her absences in January 2011 and who also

had a black balloon taped to her desk. (*Id.*) The Court notes that whether the black balloon was

intended to send a racially charged message is ambiguous. If the action was intended as a

statement on Plaintiff's race, as she contends, it is not probative of discrimination unless it was

contemporaneous with or causally related to the adverse action. *Fleishman v. Cont'l Cas. Co.*,

698 F.3d 598, 605 (7th Cir. 2012) (quoting *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140

(7th Cir. 1997)). The black balloon incident was not contemporaneous with or causally related

to the adverse employment action she alleges because it occurred several months *after* Defendant

refused to pay her for the two weeks in January. Thus, Plaintiff's lone evidence about the black

balloon taped to her desk does not constitute "a 'convincing mosaic' of circumstantial evidence

that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes v. Ill.*

*Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20

F.3d 734, 737 (7th Cir. 1994)). Therefore, the Court will analyze her claim under the indirect

method.

**B.  Whether Plaintiff has proved discrimination through the indirect method**

Plaintiff contends that she has established a *prima facie* case of discrimination. (R. 68,

Tab E, Pl.'s Mem. at 3.) The parties agree that Plaintiff is a black woman, and she is therefore a

member of a protected class. (Def.'s Facts ¶ 3; Pl.'s Rule 56.1 Resp. ¶ 3.) The other three

prongs of a *prima facie* case, however, are in dispute. (*See* R. 64, Def.'s Mem. at 9.) Defendant

argues that (1) Plaintiff did not meet its legitimate performance expectations because she was

absent from work for three consecutive weeks without permission; (2) she did not suffer an

adverse employment action because she used and was paid for all 28 days of PTO she had

available in 2011; and (3) Defendant did not treat any similarly situated employees outside the

protected class more favorable than Plaintiff. (*Id.*) Plaintiff contends that she suffered an

adverse employment actions when she was "denied the privilege of being able to utilize the days

in her Paid Time Off Bank whenever and however she chooses" and when she was required to

earn her PTO days before being paid for them. (R. 68, Tab E, Pl.'s Mem. at 3.) Plaintiff avers

that the evidence of record would allow a reasonable jury to infer that white coworkers Moser

and Griffin were treated differently and were not subject to the same adverse actions she was.

(*Id.*)

Plaintiff does not address Defendant's argument that she failed to meet Defendant's

legitimate expectations because she took three consecutive weeks off of work and did not request

the time in advance, despite knowing that Defendant expected its employees to inform it of

absences in advance when possible. (*See* R. 64, Def.'s Mem. at 9.) The Seventh Circuit has

repeatedly held that absenteeism is a legitimate reason to terminate an employee. *E.g.*,

*Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 296 (7th Cir. 1998); *Oates v. Discovery Zone*, 116

F.3d 1161, 1171 (7th Cir. 1997); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir.

1993) ("[A] worker who for whatever reason does not show up for work regularly is not a

satisfactory employee and is quite likely to be let go."). If absenteeism is grounds for

termination, it is certainly a legitimate reason to refuse to pay an employee. Plaintiff contends,

however, that Defendant's admission that the attendance policy is unwritten proves that her

absence was a pretext for discrimination. (R. 68, Tab E, Pl.'s Mem. at 7-8.)

"Normally a court should first determine if a plaintiff has established a prima facie case

before subjecting the employer to the pretext inquiry." *Collins v. Am. Red Cross*, 715 F.3d 994,

1000 (7th Cir. 2013) (quoting *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir.

2006)). "But where, as here, an employer has cited performance issues as the justification for its

adverse action, the performance element of the prima facie case cannot be separated from the

pretext inquiry." *Id.* (quoting *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486,

491 (7th Cir. 2008) (*per curiam*)) (internal quotation marks omitted).

Plaintiff argues that Defendant's admission that the attendance policy is not a written

policy "means that the stated reason is not the true reason" she was not paid. (R. 68, Tab E, Pl.'s

Mem. at 7.) Plaintiff contends that the Manager's Job Aid, an employment manual that

Defendant produced, explains the employment absence policy and proves that her absence was

only a pretext for Defendant not to pay her. (*Id.* at 7-8) (citing R. 70, Pl.'s Supporting Docs.,

Tab 7, Manager's Job Aid). The Job Aid Plaintiff relies on states that when an employee's

absence is not scheduled, the time off should be coded PTON. (R. 70, Pl.'s Supporting Docs.,

Tab 7, Manager's Job Aid). After the employee has exhausted her PTO Bank, the absence

should be coded PU or PP (personal paid), at the discretion of the manager. (*Id.*) The Job Aid

also states that when an employee is absent in excess of one scheduled workweek due to an

illness or injury, the first week away should be coded PTOS or PTON (depending on whether it

was scheduled), any days in excess of the scheduled workweek should be coded short-term

disability, if eligible, and any days in excess of the employee's PTO eligibility should be coded

PU. (*Id.*) Plaintiff insists that she was not ill or disabled, so Defendant's use of the short-term

disability code is inappropriate. (*E.g.*, Pl.'s Rule 56.1 Resp. ¶ 55.) Defendant has explained that

its policy is to code employees who are absent from work for more than a week UNDU because

it "gives the employee the benefit of the doubt and assumes that the employee is unable to work

due to injury or illness, rather than simply choosing not to come to work." (Def.'s Facts ¶ 32.)

Each of the timekeepers responsible for coding Plaintiff's January 2011 absences submitted declarations stating that they coded Plaintiff's time off in conformity with their understanding of Defendant's policy. (R. 65-7, Tab F, Del Real Decl. ¶¶ 6-9; R. 65-8, Tab G, Musser-Quist Decl. ¶¶ 5-9; R. 65-9, Tab H, Harris Decl. ¶¶ 6-9.) In addition, several e-mails between Defendant's employees indicate that this policy was the general understanding. (*E.g.*, R. 65-10, Tab I, Ex. A, Jan. 31, 2011 E-mail from Withers to Christensen, Murphy, Helms; R. 65-10, Tab I, Ex. B, Feb. 11, 2011 E-mail from Helms to Christensen, Withers, Murphy.) The Seventh Circuit has "never required proof of a written policy to show that an employer's decision was not a pretext for discrimination." *Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 769 (7th Cir. 2008). This Court thus concludes that Defendant's policy of refusing to pay workers for time off when they take more than five consecutive unapproved absences is not a pretext and that there is no underlying discriminatory reason for Defendant's refusal to pay Plaintiff for her second and third week of absences in January. Rather, the decision not to pay Plaintiff for those weeks is a reflection of her failure to live up to Defendant's legitimate expectation that its employees will not take three weeks off unless they have prior approval or are suffering from a disability. Thus, Plaintiff fails to establish a *prima facie* case of discrimination because she cannot show that she met Defendant's legitimate performance expectations.

Even if Plaintiff could establish that she had met Defendant's legitimate performance expectations, she has failed to establish other elements of her *prima facie* case. First, Plaintiff has failed to establish that she suffered an adverse employment action. The Seventh Circuit has found three general categories of adverse employment actions to be actionable under Title VII. *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004). As pertinent here, those include

22

"cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished." *Id.* (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)). Plaintiff contends that she was "denied the privilege of being able to utilize the days in her Paid Time Off Bank whenever and however she chooses." (R. 68, Tab E, Pl.'s Mem. at 3.) It is undisputed, however, that Plaintiff used all 28 PTO days available to her in 2011. (Pl.'s Rule 56.1 Resp. ¶ 58.) Thus, Plaintiff "has not alleged any material change in the conditions of her employment—she was not fired or demoted, she suffered no financial consequences and her responsibilities have not changed." *See de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008); *see also Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004) (employer's refusal to pay employee during two-day unexcused absence "did not work a quantitative or qualitative change in the conditions of his employment," and thus did not constitute an adverse employment action).

Additionally, Plaintiff has failed to identify a similarly situated employee who was not in the protected group and was treated more favorably. In order to show that a coworker is similarly situated, Plaintiff must show that the coworker had a "comparable set of failings." *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Plaintiff contends that she has established a *prima facie* case because Moser was paid for 13 days away from work during the same time period that Plaintiff was only paid for 5 days away. (R. 68, Tab E, Pl.'s Mem. at 3.) Plaintiff additionally argues that her white coworkers, Moser and Griffin, were not required to earn the days in their PTO bank before they used them, although she was. (R. 68, Tab E, Pl.'s Mem. at 3.) First, the evidence shows that neither Moser nor Plaintiff were required to earn all the PTO days they used, as both had earned one PTO day when they took five days off. In addition, neither Moser nor Griffin is similarly situated to Plaintiff, however, "because neither

23

engaged in the same conduct as Plaintiff and received pay beyond a period of five consecutive days absence." (R. 64, Def.'s Mem. at 9.) In order to be similarly situated, the employees must have engaged in similar conduct. *Burks*, 464 F.3d at 751. Because Moser and Griffin did not commit the offense Plaintiff contends triggers the discriminatory action against her—three consecutive weeks of unscheduled absence—neither are similarly situated to her.

"The failure to establish any single element of the prima facie case dooms a discrimination claim." *Airborne Exp.*, 521 F.3d 765, 768 (7th Cir. 2008). Here, Plaintiff has failed to establish multiple elements of her *prima facie* case of discrimination. Accordingly, the Court grants Defendant summary judgment on Plaintiff's race discrimination claim.

## II. Plaintiff's Hostile Work Environment Claim

Plaintiff also alleges that she was subject to a hostile work environment because she suffered harassment that Defendant failed to stop. (R. 6, Compl. ¶ 12.) "Title VII protects not just tangible employment actions but also evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Hall v. City of Chi.*, 713 F.3d 325, 330 (7th Cir. 2013) (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (internal quotation marks omitted). "Consequently, the statute protects employees against a hostile work environment so permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal quotation marks omitted). In order to establish a hostile work environment claim pursuant to Title VII, Plaintiff must prove: "(1) that her work environment was both objectively and subjectively offensive; (2) that the harassment was based on her race; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469

24

(7th Cir. 2011) *aff'd*, 133 S. Ct. 2434 (2013). Courts are "to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23).

Plaintiff's hostile work environment claim relies on the black balloon incident. (R. 68, Tab E, Pl.'s Mem. at 5.) "[I]solated incidents, unless extremely serious, will not support a hostile work environment claim." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (citing *Faragher*, 524 U.S. at 778). Plaintiff contends that taping a black balloon to her desk "is as offensive as displaying a noose," and she repeatedly states that she perceived it as "Defendant's way of calling her a 'nigger.'" (*E.g.*, R. 68, Tab E, Pl.'s Mem. at 5; Pl.'s Disputed Facts ¶ 1; R. 68, Tab B, Pl.'s Resp. ¶ 7.) Plaintiff goes on to analogize taping a black balloon to her desk to burning crosses in her front yard or lynching her. (*Id.*) While the Court finds it troubling that only Plaintiff's and Lis's desks had black balloons taped on them and understands how the incident made Plaintiff feel singled out, the Court cannot agree with Plaintiff as to the severity of the action. Burning crosses and lynchings are violent acts teeming with historical significance, and the Court declines to find the same hateful and ominous meaning in a balloon.

It is clear that Plaintiff subjectively found her workplace offensive, but there is no evidence from which the Court can find her workplace objectively offensive. *See, e.g.*, *Ellis*, 650 F.3d at 648-49 (finding two incidents of coworkers wearing confederate flag clothing and one coworker's racially offensive statement not sufficiently serious to establish a hostile work environment); *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 847 (7th Cir. 2009)

25

(supervisor's referring to black employee as a gorilla and another supervisor's comment that plaintiff wouldn't lose his job because the company wanted to appear diverse did not rise to the level of harassment); *Adusumilli v. City of Chi.*, 164 F.3d 353, 362 (7th Cir. 1998) (ambiguously sexual comments and four isolated incidents of touching by a coworker, including a poke in plaintiff's buttocks, were not sufficient to establish a hostile work environment); *cf. Lapka v. Chertoff*, 517 F.3d 974, 983-84 (7th Cir. 2008) (sexual assault, though an isolated incident, was sufficiently serious to create a hostile work environment). The black balloon incident was an isolated occurrence that, though offensive, was not physically threatening and did not reasonably interfere with Plaintiff's work performance. *See Faragher*, 524 U.S. at 787-88.

In addition, Plaintiff has failed to provide evidence showing that there was a basis for employer liability. "Employers are 'strictly liable' for harassment inflicted by supervisors, but they can assert an affirmative defense when the harassment does not result in a tangible employment action." *Vance*, 646 F.3d at 469-70 (citing *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004)). "If only coworkers were culpable for making a work environment hostile, the plaintiff must show that the employer has 'been negligent either in discovering or remedying the harassment.'" *Id.* at 470 (quoting *Williams*, 361 F.3d at 1029). In her deposition, Plaintiff testified that she believed Kris Peterson discriminated against her because after Plaintiff spoke with Peterson, the black balloon was taped on her desk. (R. 65-2, Pl.'s First Dep. at 63:2-14.) She testified, however, that she did not know who placed the balloon on her desk. (*Id.* at 63:15-17.) Plaintiff may not rely on "mere conclusions or allegations" to create an issue of fact for trial, *see Balderston*, 328 F.3d at 320, and the Court declines to assume that a supervisor was responsible for taping the balloons to the desks absent any evidence to that effect, *see Severn*, 129 F.3d at 427. Plaintiff provides no evidence

26

indicating that Defendant was "negligent either in discovering or remedying" the black balloon incident. *Vance*, 646 F.3d at 470. Absent any evidence as to who was responsible for taping the balloons to the desks or how Defendant responded to the incident, the Court finds that Plaintiff has failed to establish employer liability. Plaintiff's hostile work environment claim fails as a matter of law, and the Court grants Defendant summary judgment on this claim.

## III.   Plaintiff's Retaliation Claim

Plaintiff next alleges that in violation of Title VII, Defendant retaliated against her after her first EEOC charge. (R. 6, Compl. ¶ 12.) Title VII forbids an employer from discriminating against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The purpose of this antiretaliation provision is to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). Because of this purpose and the textual distinction between the antiretaliation provision and the antidiscrimination provision, the Supreme Court has held that "Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct"; unlike the antidiscrimination provision, the antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011) (quoting *Burlington*, 548 U.S. at 64) (internal quotation marks omitted). Instead, the pertinent inquiry is whether an employer has acted in a way that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington*, 548 U.S. at 68).

27

As with discrimination claims, a plaintiff may establish a retaliation claim by way of either the direct or indirect method. *Coleman*, 667 F.3d at 859.

Plaintiff attempts to prove retaliation through the indirect method. (R. 68, Tab E, Pl.'s Mem. at 9.) To prove retaliation under the indirect method, "the plaintiff must establish a prima facie case of retaliation by showing that: '(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner.'" *Whittaker*, 424 F.3d at 647 (quoting *Stone v. Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). If the plaintiff establishes the *prima facie* case of retaliation, the burden shifts to the employer to provide a legitimate reason for its action; if the employer meets its burden, the plaintiff must prove that the employer's reason is pretextual. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citations omitted). Here, Plaintiff fails to identify a similarly situated employee who did not complain. Thus, Plaintiff cannot prove her retaliation claim through the indirect method. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) ("the plaintiffs have not pointed to any [similarly situated employee who did not engage in protected activity]. Thus, we can again make short work of the plaintiffs' arguments under the indirect method.") For the sake of completeness, however, the Court will analyze Plaintiff's retaliation claim under the direct method. To establish retaliation under the direct method, Plaintiff "must satisfy three elements. First, [she] must show that [she] engaged in protected activity under Title VII. Second, [she] must show that [she] suffered an adverse employment action. And third, [she] must show that there is a causal link between [her] protected activity and the adverse action." *Id.* at 1106 (citing *Coleman*, 667 F.3d at 859) (internal citations omitted).

28

There is no dispute that Plaintiff engaged in an activity that is protected by Title VII by filing an EEOC charge. The next inquiry is whether Plaintiff experienced any adverse employment actions. Plaintiff identifies the following as retaliatory adverse actions by Defendant: (1) changing her work environment by removing her from the Work-at-Home program and isolating her from her team at the call center; (2) giving her excess occurrences for the three-week absence in January 2011; (3) requiring her to agree to drop her claims in order to receive her severance pay; (4) denying her use of FMLA benefits, which led to unwarranted occurrences on her record; (5) removing the half-wall that blocked the noise from her desk; (6) improperly giving her an occurrence on August 20, 2011, instead of allowing her to use the PTO she was approved for; (7) denying her sufficient time to complete her continuing education requirements; (8) deactivating her ID badge; and (9) the black balloon incident. (*Id.* at 3-6; R. 6, Compl. at 11-12; Pl.'s Disputed Facts ¶¶ 12, 14, 18, 19, 23.)

Plaintiff was removed from the Work-at-Home program and received occurrences for her January 2011 absence before she complained of discrimination. Thus, neither of those incidents could have occurred in retaliation of her complaint. Plaintiff's allegations that they were in retaliation for her 2009 internal complaint are unconvincing, as Plaintiff testified that her 2009 complaint did not indicate any allegation of discrimination on the basis of either race or sex. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) ("there generally can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity"). Additionally, incidents that were resolved in Plaintiff's favor do not constitute adverse employment actions under Title VII. *See, e.g., Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1121 (7th Cir. 2009) (where the plaintiff filed a grievance regarding a suspension and the grievance was resolved in his favor so he never served

29

the suspension, "the prospect that the suspension would be upheld" did not constitute an adverse employment action because the plaintiff suffered no economic harm); *Whittaker*, 424 F.3d at 648 (actions that have no tangible job consequences are not adverse employment actions); *Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, No. 09 C 1824, 2011 WL 4738520, at *18 (N.D. Ill. Oct. 5, 2011) (finding no retaliation because the plaintiff could not provide an adverse employment action where "no discipline was issued and there was no loss in benefits"); *Lilly v. Potter*, No. 08-CV-00137, 2010 WL 4791490, at *6-*7 (N.D. Ill. Nov. 18, 2010) (holding that discriminatory disciplinary actions were not adverse employment actions because "although [the defendant]'s discipline of [the plaintiff] was procedurally defective, [the defendant] rescinded all of the disciplinary actions shortly after they were issued," and denials of sick leave were not materially adverse employment actions because the improper denials were corrected and paid). Accordingly, the denial of Plaintiff's FMLA request, the occurrence Plaintiff received on August 20, 2011, and the security badge incident are not adverse employment actions because they were resolved in Plaintiff's favor: the timekeeping for Plaintiff's FMLA leave and her tardy on August 20, 2011, was corrected, (Def.'s Facts ¶¶ 62, 68), the occurrences she received were removed, (*id.*), and her security badge was fixed after the one time she was denied access to the building, (*id.* ¶ 65).

In addition, courts in this District have consistently held that requiring employees to sign releases as a condition for receiving severance benefits is permissible. *See, e.g.*, *Sicher v. Merrill Lynch*, No. 09 C 1825, 2011 WL 892746, at *4 (N.D. Ill. Mar. 9, 2011) ("Payments offered to a former employee in exchange for a release of legal claims—whether the parties call the payment a severance or a settlement—are a discretionary benefit and do not constitute adverse employment action where those payments are not required by a contract."); *Davis v. Precoat*

30

*Metals, a Div. of Sequa Corp.*, 328 F. Supp. 2d 847, 852 (N.D. Ill. 2004); *Gray v. N. Telecom, Inc.*, No. 95 C 7485, 1998 WL 386359, at *8 (N.D. Ill. July 6, 1998). Burno notified every employee at WCCC that they were eligible to receive severance pay but were required to sign a general release and waiver of all claims in accordance with the Allstate Severance Pay Plan, and Burno met with Plaintiff separately to make sure she understood the consequences of signing the waiver to her pending claims in this suit. (R. 72-1, Burno Decl. ¶¶ 5-6, 11.) The evidence in the record would not allow a reasonable juror to infer that the General Release and Waiver was unique to Plaintiff or in retaliation to Plaintiff's complaints of discrimination.

That leaves Plaintiff with the removal of the half-wall next to her desk, the lack of sufficient time to complete her continuing education requirements and the black balloon incident as her remaining evidence of retaliation. Even though the category of "materially adverse actions" under Title VII's antiretaliation provision "sweeps more broadly than the adverse employment actions required to sustain a discrimination claim," not every disruption or alteration to the workplace is an adverse action for the purpose of a retaliation claim; "context is a crucial consideration." *Benuzzi*, 647 F.3d at 655 (citing *Burlington*, 548 U.S. at 69). Once again, the Court agrees with Plaintiff that the black balloon incident is disturbing and was potentially intended to send a racial message. Once again, however, the record does not support finding that the black balloon incident gives rise to a cause of action. The black balloon incident was an isolated, one-time occurrence. Plaintiff does not know who put the balloon on her desk or why, and no one made any comments about Plaintiff's race or about her charge of discrimination. (R. 65-2, Pl.'s First Dep. at 80:23-82:17.) The Court concludes that a reasonable juror would not find a black balloon threatening, and a reasonable person would not be dissuaded from complaining. *See Brown*, 700 F.3d at 1107-08 (collecting cases and holding that a

coworker's incivility, mild name-calling, and threatening statement that "paybacks are hell" would not dissuade a reasonable person from complaining of discrimination); *Henry v. Milwaukee Cnty.*, 539 F.3d 573, 587 (7th Cir. 2008) (holding that unspecified intimidation, door-slamming by superiors, and other "petty slights and minor annoyances" would not deter a worker from reporting discrimination); *Rhoads v. Rieth-Riley Constr. Co.*, No. 3:11-CV-366-TLS, 2013 WL 1281749, at *19 (N.D. Ind. Mar. 26, 2013) (holding that a coworker's encroachment of the plaintiff's physical space would not dissuade a reasonable person from making a charge of discrimination). The Court cannot find that the black balloon incident was a materially adverse employment action for the purpose of her retaliation claim.

Plaintiff contends that the insufficient time to complete her continuing education was materially adverse because it caused her to receive a lower score on her performance rating, which in turn impacted her potential bonus. This may be a materially adverse employment action that would dissuade a reasonable person from filing complaints. *Compare Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 741 (7th Cir. 2011) ("a negative performance evaluation could constitute an adverse action within the meaning of the direct method of proving retaliation") *with Volovsek v. Wisc. Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003) (negative performance reviews "do not, themselves, amount to the kind of adverse employment action that constitutes discrimination or retaliation"). The Court need not determine if the insufficient time for her continuing education was materially adverse, however, because Plaintiff fails to provide evidence of a causal link or "a retaliatory animus," which is an essential element of the direct method of proving retaliation. *See Brown*, 700 F.3d at 1108 ("plaintiffs must also provide evidence that a retaliatory animus motivated the denials").

Plaintiff argues that "suspicious timing" provides the causal link between her discrimination charge and the retaliatory acts. (R. 68, Tab E, Pl.'s Mem. at 9.) Plaintiff was notified that she would only receive three hours to complete her continuing education on June 22, 2011, approximately one month after she notified Defendant that she was filing a charge of discrimination. (R. 70, Pl.'s Supporting Docs., Tab 34, June 22, 2011 E-mail.) Plaintiff relies on *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 905 (7th Cir. 2006), for the proposition that circumstantial evidence can provide the causal link to prove retaliatory intent. In *Sylvester*, however, suspicious timing was part of a "mosaic of circumstantial evidence" pointing to a retaliatory intent. *Id.* Here, suspicious timing is the only evidence of the causal link Plaintiff offers. "[S]uspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial." *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008). "Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004) (internal citations omitted). Plaintiff does not provide other evidence to support the causal link, however, and she fails to demonstrate that the decision-maker knew of her discrimination charge. "A claim of retaliation based on suspicious timing depends on what the relevant decision-makers knew and when." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011). Plaintiff fails to allege, let alone provide evidence showing, that the Timekeeping Department, who made the decision to allot three hours for the continuing education, knew of her complaint. Instead, she suggests a broad conspiracy involving actors in every department of Allstate. (R. 65-3, Pl.'s Second Dep. at 9:3-11:7.) Plaintiff's allegations, without proof, do not create a material issue of fact for the jury. *See Balderston*, 328 F.3d at 320.

33

Similarly, the only evidence Plaintiff provides to support her allegation that the half-wall next to her desk was removed in retaliation, an allegation Defendant contests, is several e-mails from her to Courtney Breath, the WCCC Manager, explaining the incident. (R. 70, Pl.'s Supporting Docs., Tab 50, Feb. 8, 2013 E-mails). In one of her e-mails, Plaintiff concedes that "we are uncertain of why the 1/2 wall was moved." (R. 70, Pl.'s Supporting Docs., Tab 50, Feb. 8, 2013 E-mails.) The lapse of seventeen months between this event and Plaintiff's second EEOC charge does not allow an inference of causation by way of suspicious timing, *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) *cert. denied*, 133 S. Ct. 489 (2012), and Plaintiff provides no additional evidence or arguments that would allow a jury to infer retaliatory intent. Because Plaintiff cannot provide a sufficient causal link to prove that any potential adverse employment action was motivated by a retaliatory intent, Plaintiff's retaliation claim fails as a matter of law.

## CONCLUSION

The Court acknowledges that the incidents that occurred in Plaintiff's workplace, while not rising to the level of a hostile work environment for the purposes of Title VII, clearly made her uncomfortable and made her workplace unpleasant. Yet, the Court's empathy for Plaintiff's pains cannot justify a ruling in her favor. Plaintiff was not able to provide evidence that showed any genuine issue of material fact that would require a jury trial determination of her race discrimination, hostile work environment, and retaliation claims. Therefore, this Court GRANTS Defendant's motion for summary judgment (R. 63) in its entirety. The Clerk of the Court is directed to enter judgment in Defendant's favor.

ENTERED: _____

**Chief Judge Ruben Castillo**
**United States District Court**

**Dated: November 5, 2013**